367 P.2d 758

William D. HANSEN, Plaintiff-Respondent,

v.

Jay BLEVINS, Defendant-Appellant.

No. 9017.

Supreme Court of Idaho.

Jan. 2, 1962.

Rayborn, Rayborn, Rayborn & Webb, Twin Falls, for appellant.

Benoit & Benoit, Twin Falls, for respondent.

TAYLOR, Chief Justice.

On the afternoon of May 27, 1958, plaintiff (respondent), while a patron in a bar, owned and operated by defendant (appellant), became involved in an argument with another patron. The defendant, who was tending bar at the time, testified to the altercation as follows:

"A. So, they kept on, and they started cussing, see, so Mr. Hansen started cussing Babe [the other patron], see, and called him names, so I said, 'Here. We can't have that in my place,' you see, so I asked them to, you know, to quieten down, so thay quietened down, and the first thing I knew they started up again, and the first thing I know Bill Hansen got Babe by the shirt collar and undertake to choke him, and the first thing I know why they got together, and there was a few licks passed, you know, about the body, and the first thing I know why I noticed the place appeared that Babe had hit Bill up at the side of the eye, and it was bleeding down the side—

"Q. Blood was running down the side of his face? A. Yes. And by the time I got across the bar they had run into my tables and chairs on the far side of the bar, so when I got over there I said, 'Here, boys. We can't have no trouble in my place of business.' So, then I undertake to part them, see, separate them. So, Bill Hansen got mad over it, you know, and so then I said, 'Well, there's no use having any trouble. Look here, Bill. You're jumping onto a man sixty-one years old.' And, I said, 'It's all uncalled for to have any trouble.' So, I said, 'You boys go over and sit on the stool, and you can remain in the place if you will be a gentleman and if you can't you will have to get out.' So, they started taking two or three steps in there, and they started in again, see.

"Q. Started in fighting again? A. Yes.

"Q. All right. A. So, they went together and Babe got a-hold of Bill, oh, in about the neck, you know, and had him back and still Bill was hitting him underneath in the cheek here, so I separated them again. I turned them around and thought we had it all settled, and they were going to their stools, so, in the meantime, Bill Hansen accused me of Babe and I, in other words, doubling up on him, so I said, 'No. I don't show no partiality or take no sides.' In the meantime he says, 'I'm going across the street and get an evener, and I will wipe you sons-of-bitches out.' I said, 'Listen, Bill. We can't have that in our place.' * * * I said, 'Now, Bill, listen. We are both

in business.' I said, 'There's no use having any trouble.' I says, 'Please be quiet or leave the premises.' "

Defendant further testified that plaintiff then went across the street to a cafe owned and operated by plaintiff and his wife, and returned in about three minutes; and,

"A. When he came back he entered the door, I would say, about four feet.

"Q. What did you do? A. I met him. I said, 'Bill, I warned you when you left to not come back and please get out.' And he got out in front. I went along behind him, see, you know, getting him on out aways. And he turned on me, and he ups and takes to go in with his right hand about so far like he was going after a weapon, so I pleaded with him, you know, to not give me any trouble, and I was working to get him away, so I had to shoot him, it looked like, for self defense. [Defendant discharged a tear gas gun in the face of the plaintiff.] * * *

"Q. Did you think he had a gun? A. Yes. In other words, it showed he was not ready to quit in the place, and when he come back he was. ready. When he came in the door he said, 'Jay, come out.' He said, 'I'm ready for you now.' * * * That's why I taken the gas gun and tried to plead with him to leave my place. In case he did pull a weapon on me I did have a chance to keep him from coming back in. In other words, I didn't want him to give any more trouble in my place or kill anybody. * * * He stumbled back and fell off the sidewalk right at the edge of the sidewalk. That was right in front of my door, pretty close to my door when all the trouble was performing."

As a result of the tear gas, plaintiff's eyes were injured. This action brought by plaintiff for damages, resulted in a verdict and judgment in his favor against the defendant Blevins.

The bar being operated by the defendant Blevins was the community property of himself and wife. Mrs. Blevins was not made a party to the damage action. Execution, issued for the satisfaction of the judgment, was levied upon certain community real property belonging to Blevins and his wife. Defendant Blevins then moved to quash the levy upon the ground that the judgment was based upon his intentional tort, and that the community property belonging to himself and wife was not subject to execution for the payment of such a liability. This appeal is prosecuted from the order denying the motion to quash.

Defendant urges that the judgment, being a liability incurred by the husband, as the result of an intentional or malicious tort, is a separate debt of the husband, and that the community property is not liable there-

-for. The applicable provision of our community property law is as follows:

"The husband has the management and control of the community property, except the earnings of the wife for her personal services and the rents and profits of her separate estate. But he can not sell, convey or encumber the community real estate unless the wife join with him in executing and acknowledging the deed or other instrument of conveyance, by which the real estate is sold, conveyed or encumbered: * * *." I.C. § 32–912.

In Holt v. Empey, 32 Idaho 106, 178 P. 703, this court was concerned with the validity of a levy made upon community real property for the satisfaction of a judgment entered against the husband as a surety for a third party. The appellant in that case contended that if the court should hold the community property subject to the payment of the separate debt of the husband, it would be allowing the husband to do indirectly what he could not do directly. The court said:

" * * * We therefore hold that community real estate is liable to attachment and execution for the debts of the husband, whether incurred for his own use or for the benefit of the community." Holt v. Empey, 32 Idaho 106, at 110, 178 P. 703, 704. See also

Gustin v. Byam, 41 Idaho 538, 240 P. 600.

Defendant urges a distinction between this case and Holt v. Empey, contending that a contractual obligation, in theory at least, involves some benefit to the community and is subject to some degree of control by the wife; whereas, an intentional tort confers no benefit and cannot be subject to control by the innocent spouse.

Defendant relies upon decisions from Arizona and Washington and cites Shaw v. Greer, 67 Ariz. 223, 194 P.2d 430; Newbury v. Remington, 184 Wash. 665, 52 P.2d 312; Smith v. Retallick, 48 Wash.2d 360, 293 P.2d 745. The Washington statute, however, contains a provision, not found in our law, as follows:

"Provided, however, that all such community real estate shall be subject to the liens of mechanics and others for labor and material furnished in erecting structures and improvements thereon, as provided by law in other cases, to liens of judgments recovered for *community debts,* and to sales on execution issued thereon." (Emphasis added.) Rev.Code of Wash. § 26.16.-040.

Arizona follows Washington precedents because of the similarity of the statutes of the two states. Cosper v. Valley Bank (Ariz.) 237 P. 175. In those jurisdictions the community property is immune from

obligations resulting from a tortious act of one of the spouses not concurred in or ratified by the other, unless the wrongful act was committed for the benefit or protection of the community property, or was so intended. In cases where the tort was intended as a benefit to, or for the protection of, the community, the liability arising therefrom becomes a "community debt."

Quoting from an earlier case, the Washington court in Newbury v. Remington, et ux., supra, said:

"'The controlling consideration is, was the tortious act of Neslin, the husband, committed by him in the management of the community property or for the benefit of the community? If so committed, the community must be regarded as having committed the act, and thereby rendered itself liable therefor.'" 52 P.2d 313.

In La Framboise v. Schmidt, 42 Wash.2d 198, 254 P.2d 485, the Washington court held the community liable, under the doctrine of respondeat superior, for damages resulting from a tort committed by the husband in taking indecent liberties with a six year old girl temporarily placed in custody of the community for pay. The decision was based upon the ground that the husband's acts were committed in prosecution of the business of the community, i.e., the care of the child. The court said:

"Both parties are agreed that the liability of a community for the torts of the spouses is placed upon the theory of respondeat superior, and that it is the law of this state that the community is not liable for the torts of the husband, unless the act constituting the wrong either (1) results or is intended to result in a benefit to the community or (2) is committed in the prosecution of the business of the community." 254 P.2d at 486.

In a later decision, Mortensen v. Knight, 81 Ariz. 325, 305 P.2d 463, the Arizona court held, three to two, that the husband's interest in community property was liable for the negligent operation of a community automobile by the wife. This conclusion was arrived at by application of the family purpose doctrine, under which the wife became the agent of the husband and he was required to respond as her superior. The doctrine and its application was predicated on the husband's management and control of the community property. As such manager he was charged with complete control of the use of the family car. The wife was killed in the accident, and the court went on to say:

"Under the circumstances, where the wife is not deceased or her personal representative can be joined in the action, the whole of the community property is, of course, subject to the satis-

faction of the judgment." 305 P.2d at 469.

In the Mortensen case the Arizona court reviewed the history of the community property law in the western states (including Idaho) and concluded that the Arizona system came from Texas by way of California, and that the decisions of Washington "while informative, are not necessarily more persuasive than either of those of the states of California or Texas."

■ Defendant also calls attention to the rule obtaining in this jurisdiction that the interest of the wife in community property is a present vested interest, equal in degree, nature and extent to that of the husband. Willes v. Palmer, 78 Idaho 104, 298 P.2d 972; Anderson v. Idaho Mutual Benefit Association, 77 Idaho 373, 292 P.2d 760. It is urged that the decisions of the Washington and Arizona courts are more persuasive because in those jurisdictions the interest of the wife in the community estate is also recognized as a present, existing, vested interest (Grimditch v. Grimditch, 71 Ariz. 198, 225 P.2d 489; Schwartz v. Schwartz, 52 Ariz. 105, 79 P.2d 501, 116 A.L.R. 633; Occidental Life Ins. Co. v. Powers, 192 Wash. 475, 74 P.2d 27, 114 A.L.R. 531); whereas in the states adopting the rule that the community is liable for obligations incurred through the tort of the husband, the interest of the wife in the community prop-

erty was regarded as a mere expectancy. Prior to 1927 the California court had held that the wife had no present, vested right in the community property, and that her interest was a mere expectancy. In 1927 the legislature added section 161a to the Civil Code. This section provided that,

"The respective interests of the husband and wife in community property during continuance of the marriage relation are present, existing and equal interests under the management and control of the husband * * *." California Civil Code, § 161a.

In Grolemund v. Cafferata, 17 Cal.2d 679, 111 P.2d 641, the husband had suffered a judgment for damages arising out of his negligence in the operation of his car. Inter alia the court said:

"Section 172a of the Civil Code gives the husband 'the management and control of the community real property', subject to the proviso that in regard to conveyances the wife must join with him in executing the necessary instruments. Since this restriction concerns only voluntary transfers, it has no application to the instant case involving the satisfaction of a judgment by levy of execution, so that for all practical purposes herein the husband's power of management and control of the community real property involved here is

as absolute and complete as it is with respect to community personal property, as outlined in section 172. That the addition in 1927 of section 161a, defining the interests of the spouses in community property, did not change the rule vesting in the husband the entire management and control of the community property is manifest by the express recognition accorded sections 172 and 172a in the later statute. * *

"With reference to California legislation on the question of liability or exemption of property of the spouses for payment of obligations arising out of the husband's tort, the sole enactments are section 168, which exempts the wife's earnings (community property) from liability for debts of the husband, and section 171, which extends the same exemption in respect to the wife's separate property. [Same as our I.C. § 32–911.] It is significant to note that nothing is said in regard to the liability of the husband's separate property, the husband's earnings, or the balance of the community property (the wife's earnings excepted by Civ.Code, sec. 168) in regard to an obligation created by the husband's tort. From this silence of the legislature it logically can be inferred that it was thereby intended that the husband, as agent of the community, should retain the power to divest the parties of their community property by his own act in the same manner that he might divest himself of his separate property, so long as he did not make a gift of the former without consideration. To hold that the husband could not subject the community property to liability for his tort would be to hold that he could not manage and control the same. To illustrate, suppose that the tort action had never been instituted by Emilio Cafferata and his coplaintiffs, but that Caesaer Grolemund, after injuring these parties, had made a voluntary settlement of his liability. It cannot be said that the husband would be without power to use common funds to pay for the damages sustained by the injured persons because of his negligent act. Or let us suppose that the damage suit was brought and judgment had gone against Caesaer Grolemund, as here, but that no execution had been levied, it is obvious that the husband could satisfy such judgment voluntarily from a bank account under his control but which consisted of community funds. The foregoing analysis compels us to conclude that there is no logical distinction to be drawn between satisfaction of a judgment against the husband by levy of execution against the community property and satisfaction of

a like judgment by the husband's voluntary payment from community funds." 111 P.2d at pp. 643, 644.

After making reference to the Washington concept of "community debts" and noting the absence of such concept in California law, the court said:

"our community system is based upon the principle that all debts which are not specifically made the obligation of the wife are grouped together as the obligations of the husband and the community property * * *. This proposition was confirmed in Street v. Bertolone, 193 Cal. 751, 753, 226 P. 913: 'The term "the debts of the husband," unless otherwise qualified, includes debts incurred by the husband for the benefit of the community as well as his own separate debts.'" 111 P.2d at pp. 645, 646.

In New Mexico the wife's interest in community property is regarded as segregable and subject to the satisfaction of a judgment against her for her personal tort. McDonald v. Senn, 53 N.M. 198, 204 P.2d 990, 10 A.L.R.2d 966.

In Texas the community property is liable for the tort of either spouse. The separate property of the husband is not liable for the tort of the wife. The separate property of the wife and the income from her separate property and her personal earnings, are not liable for the tort of the husband. Annotation 10 A.L.R.2d § 9, pp. 997, 998.

■ It is not necessary to a decision in this case to determine whether community property is liable in all cases for the payment of obligations incurred by the tort of the husband. Here the record shows that the defendant committed the battery while he was actively and actually engaged in the management of the community business, and that what he did was intended to be for the protection of community property and in the interest of the community business. Under such circumstances the community is responsible for his acts. McFadden v. Watson, 51 Ariz. 110, 74 P.2d 1181; McHenry v. Short, 29 Wash.2d 263, 186 P.2d 900; 41 C.J.S. Husband and Wife § 523.

The order is affirmed.

Costs to respondent.

SMITH, KNUDSON, McQUADE and McFADDEN, JJ., concur.